**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

KATIE WILSON,

Plaintiff,

v.

XYLEME, INC.,

Defendant.

Case No. 24-cv-4444 (LMP/EMB)

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**(REDACTED)**

---

Andrew D. Peters, **Peters PLLC, St. Louis Park, MN**, for Plaintiff.

Jessica L. Roe and Alex Rubenstein, **Roe Law Group PLLC, Minneapolis, MN**, for Defendant.

Plaintiff Katie Wilson was terminated from her position at Defendant Xyleme, Inc., during a reduction-in-force ("RIF"). Wilson alleges that her termination was in bad faith and constitutes gender discrimination and reprisal in violation of the Minnesota Human Rights Act ("MHRA"). Xyleme moves for summary judgment on all of Wilson's claims. For the following reasons, Xyleme's motion is granted.

## BACKGROUND

***Wilson's Work at Xyleme***

Xyleme hired Wilson in October 2022 as an Area Vice President of Sales and tasked her with increasing sales for Xyleme's services and technology solutions. ECF No. 6 ¶ 9; ECF No. 62-4 at 2. In the summer of 2023, Wilson began working on a Request for Proposals ("RFP") from Philips Healthcare, which presented an opportunity to significantly expand Xyleme's sales to Philips. ECF No. 75-1 at 130:1–4; ECF No. 75-3

at 54:18–56:8. In Wilson's 2023 performance review, Wilson's supervisor, Brad Swingruber, wrote that Wilson had done a "great job" in developing her sales territory. ECF No. 77 at 5. Swingruber noted, however, that he "need[ed] to see movement on other pipeline deals as well," and that it was "important we dig into the new opportunities to start seeing net new bookings." *Id.*

At the end of 2023, Xyleme was acquired by MadCap, a software company founded and led by Anthony Olivier. ECF No. 6 ¶¶ 27, 29. Following the acquisition, Olivier assumed the role of Xyleme's CEO. *Id.* ¶ 29. Wilson asserts that Olivier had a reputation at Xyleme for preferring men over women and that the company, under his leadership, was "an environment of toxicity for women." ECF No. 62-9 at 15:5–19. Wilson states that she saw "men getting more opportunities than women" at Xyleme, "men being listened to more than women," and "women being spoken to as if they were children and not adults." ECF No. 75-1 at 12:8–15. As one example, Wilson contends that one of her male colleagues, D.D., received the "best territory," and that Olivier "showed up to [D.D.'s] pre and post and strategy meetings." *Id.* at 269:1–10. In contrast, Olivier "refused" to attend strategy meetings with Wilson. *Id.* at 130:24–131:2. Wilson also stated that Olivier "singled out women" during calls with Xyleme's sales team, taking an inordinate amount of time to ask granular questions about their sales opportunities that Olivier did not ask of male sales representatives. *See id.* at 232:12–234:15. Wilson also observes that Xyleme's Vice President of Marketing, Kizaan Knapp, resigned from Xyleme in August 2024 without lining up another job. ECF No. 75-4 at 50:18–51:2. In a text message to Knapp around the time that she resigned, Wilson wrote, "[F]uck the misogyny around here." ECF

No. 62-11 at 3. Knapp responded, "So much misogyny! It's so fucken blatantly obvious." *Id.* Knapp also stated that she told another female Xyleme employee that "part of her struggle will be dealing with [Olivier] only listening to men."[1] *Id.*; ECF No. 75-4 at 43:13–20.

By summer 2024, Wilson was working nearly exclusively on coordinating the process for the Philips RFP and managing the deal through its various stages. ECF No. 75-1 at 130:1–9; ECF No. 62-13 at 14–15. Olivier was also assigned to work on the Philips RFP in an "executive alignment" role. ECF No. 75-1 at 129:11–21. Olivier joined negotiation meetings between Philips' and Xyleme's sales team and, according to Wilson, Olivier frequently interrupted her during the meetings (including telling Wilson to "be quiet" during one meeting) and asked male representatives from Philips to verify the truth of Wilson's statements. *Id.* at 130:18–131:17; ECF No. 62-13 at 14. Wilson states that Olivier also "treated Philips' female negotiator . . . differently than her male colleagues." ECF No. 62-13 at 15.

On August 7, 2024, Wilson messaged Olivier and stated, "I've been sensing a lot of animosity coming from you toward me in the last week on calls with Philips present," and asked Olivier for a "certain level of respect" and to "address [issues] 1:1 before it affects revenue outcomes." ECF No. 62-10 at 2. Olivier responded that he was "sorry" that Wilson felt that way but expressed his view that Wilson had come across as

---

[1] Wilson cites statements from other colleagues at Xyleme, but for the reasons discussed below, the Court cannot consider those hearsay statements on a motion for summary judgment.

"argumentative," "short," "frustrated," and "combative" during Xyleme's calls with Philips. *Id.* at 2–3. Olivier stated that he "needed to step in where appropriate" so that "these emotions" do not "come across to the customer." *Id.* at 2. Wilson asked if they could "move forward with mutual respect and act as a team. *Id.* at 3. Olivier responded that he would be "more aware of [his] tone," and that he appreciated Wilson bringing the issue to his attention. *Id.*

Later that day, however, when Olivier messaged Wilson requesting additional executive contacts for her business opportunities, Wilson responded, "Not sure why you keep insinuating I have no more [opportunities] for 2024." *Id.* at 4. Olivier responded, "I am not insinuating you have nothing. I am asking what they are and who the contacts are, where they are in the stage of evaluation so I can [come] over the top and try [to] help move it along for you. Why you so combative [about] this?" *Id.* Wilson responded:

> Calling me combative and [] saying I was combative on a very contentious negotiation call that I kept on track without offending Philips seems very gendered and disrespectful to me. . . . Can you please consider when speaking to me if you are viewing my assertiveness and ability to control contentious negotiation calls from [a] gendered perspective? Would you call a man that added revenue while in negotiations, got Philips to allow them to write their formal RFP, and is generally treated with respect by a rowdy group contentious? Something to think about.

*Id.* at 4–5. Olivier responded, "[T]here is nothing gender specific about my comment regarding the nature of the call with [Philips]. I was just taken aback that you spoke to the prospect in that tone. Just [bringing] it forward so you can be aware and [an] area of improvement to consider." *Id.* at 5.

***Xyleme Considers a RIF; Wilson Is Laid Off***

When MadCap acquired Xyleme at the end of 2023, Xyleme was operating at a financial loss. ECF No. 62-1 at 31:15–20. As an effort to "right size the business as part of that acquisition," Xyleme laid off 16 employees during a RIF in February 2024. *Id.*; *see* ECF No. 62-5 at 10–11. Ten of these employees were male, and six were female. ECF No. 62-5 at 10–11. Yet the February 2024 RIF did not improve Xyleme's financial situation, as Xyleme's sales team only hit 37% of its quota for the first half of 2024, and through June 2024, the sales team was only projected to achieve 56% of its quota for all of 2024.[2] ECF No. 61 at 2. During the summer of 2024, therefore, Xyleme began to explore the possibility of conducting a second RIF to, in Olivier's words, "further trim overall expenditure to get in line with a more profitable business." ECF No. 62-1 at 31:21–32:2.

In June 2024, Olivier asked Swingruber to prepare a report that detailed which employees Swingruber believed should be included in a RIF, with sales numbers to support his recommendation. *Id.* at 76:18–77:25. In his report, Swingruber recommended that Olivier include "reps who have the smallest pipeline and would have the least likelihood of contributing significant ARR[3] in the back half of the year." ECF No. 63 at 3. Swingruber listed Wilson, along with two of her colleagues, Z.V. (a man) and E.M. (a woman), as the account executives who fit this description, although Swingruber recognized that all three

---

2 In its interrogatory responses, Xyleme stated that its sales team had hit 50% of its quota for the first half of 2024. ECF No. 62-5 at 14.

3 "ARR" stands for "annual recurring revenue," which is the amount of new sales revenue that an account executive brings to Xyleme on a year-over-year basis. ECF No. 62-5 at 7; ECF No. 62-6 at 27:12–21.

of them had "legitimate deals closing in Q3, so there would need to be coverage for them" if they were laid off. *Id.*

Olivier decided to conduct the second RIF based on employees' ARR performance, rather than on their pipeline performance. ECF No. 62-1 at 81:6–16. Olivier explained that he did so because he preferred to focus on an employee's "actual sales performance," rather than speculative future deals that may never close. *Id.* The account executives with the lowest ARR for 2023 and 2024 were Wilson, E.M. (a woman) and J.D. (a man). ECF No. 68 at 3. These three representatives had $0 in new business ARR. *Id.* While Wilson had $[redacted] in business expansion ARR, E.M. and J.D. had $0. *Id.* On August 8, 2024, Olivier decided to terminate E.M. and Wilson as part of the RIF but not J.D. ECF No. 62-1 at 85:14–25; ECF No. 62-5 at 7. On August 29, 2024, however, Olivier decided to add J.D. to the RIF, explaining that although he would let J.D.'s supervisor decide whether to keep him, Olivier thought it was "obvious" that J.D. should be terminated because he was a "[b]rand new rep, no sales experience, not ramped/trained, no opportunities that he is working that I am aware of, and does not make sense if we are letting go two reps that are seasoned with open opps but not him." ECF No. 77-1 at 2 (citation modified). At that point, J.D. had only been an account executive for approximately a month and had "zero sales, zero pipeline, and wasn't even ramped up in terms of a rep from a knowledge perspective." ECF No. 75-1 at 80:14–20, 106:24–107:3. Olivier largely made the RIF determinations alone; he did not consult Xyleme's human resources director and used Swingruber's report as a "sanity check." *Id.* at 78:3–16; ECF No. 75-5 at 62:22–65:15.

Pursuant to the RIF, Wilson, E.M., and J.D. were terminated on September 3, 2024.[4] ECF No. 62-5 at 5. Wilson later requested a truthful reason for her termination under Minn. Stat. § 181.933. ECF No. 62-8. Xyleme informed Wilson it selected employees for the RIF based on "individual historical sales performance in relation to other account executives in 2023 and year-to-date in 2024," and that the "lowest performing account executives, particularly based on new business generated . . . were selected for termination." *Id.*

On November 12, 2024, Wilson filed suit against Xyleme in Minnesota state court. *See* ECF No. 1-1. Xyleme removed the case to federal court on December 10, 2024, invoking the Court's diversity jurisdiction. *See* ECF No. 1. Wilson alleges three state-law claims against Xyleme: (1) sex discrimination in violation of the MHRA, ECF No. 1-1 ¶¶ 65–70; (2) reprisal in violation of the MHRA, *id.* ¶¶ 71–77; and (3) bad faith termination, *id.* ¶¶ 78–81. Xyleme moves for summary judgment on all claims. ECF No. 58.

**ANALYSIS**

Summary judgment is proper only if "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Riedl v. Gen. Am. Life Ins.*, 248 F.3d 753, 756 (8th Cir. 2001) (citation omitted) (internal quotation marks

---

[4] A fourth employee from a different team than Wilson, E.M., and J.D. was also terminated as part of the September 2024 RIF: V.D., a woman. ECF No. 76 at 19; ECF No. 77-4 at 2. The parties largely do not discuss how V.D.'s termination is relevant to Wilson's claims, so the Court will discuss the September RIF as encompassing only the other three employees: Wilson, E.M., and J.D.

omitted). At this procedural juncture, the Court does "not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." *Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1024 (8th Cir. 2021) (citation omitted) (internal quotation marks omitted). The Court must view the record in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If a party fails to properly address another party's assertion of fact, the Court may "consider the fact undisputed for purposes of the motion" and "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

## I. Evidentiary Disputes

As a threshold matter, the parties dispute whether certain evidence offered by Wilson may be considered on a motion for summary judgment. ECF No. 59 at 10–11, 16–17; ECF No. 76 at 31–32. At summary judgment, the Court may only consider evidence that would be "admissible or useable at trial." *Moore v. Indehar*, 514 F.3d 756, 758 (8th Cir. 2008) (citation omitted). Inadmissible hearsay, therefore, "may not be used to support or defeat a motion for summary judgment." *Brooks v. Tri-Systems, Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005).

Wilson relies on several statements made by her colleagues at Xyleme, but Xyleme argues that those statements are inadmissible hearsay. ECF No. 59 at 10–11, 16–17; ECF No. 79 at 11–12. Specifically, Xyleme challenges the following:

- A statement by Wilson's colleague, J.M., who told Wilson at a company event that Olivier directed his temper toward women. ECF No. 76 at 5 (citing ECF No. 75-1 at 134:13–135:9).

- A statement by Knapp purportedly made during a team meeting that Olivier had created a "toxic environment for women" and that Knapp had to leave "for her sanity." ECF No. 76 at 9 (citing ECF No. 75-1 at 135:10–20).

- A statement by Wilson's colleague, K.B., who allegedly told Wilson that she couldn't believe how rudely Olivier was treating Wilson and that Wilson needed to "watch out" for him. ECF No. 76 at 8 (citing ECF No. 75-1 at 149:7–25).

- Another statement from K.B., who allegedly described MadCap's leadership as "misogynistic" and told Wilson that Wilson was "one of the ladies that's being targeted" by Olivier and advised Wilson to get her "résumé ready." ECF No. 76 at 8–9 (citing ECF No. 75-1 at 150:20–151:20, 263:12–19).

- A statement from Wilson's colleague, B.B., who purportedly told Wilson that "it looked like [Wilson] was being targeted and treated differently and that it was because of [her] gender." ECF No. 76 at 31–32 (citing ECF No. 75-1 at 266:23–267:15).

Wilson does not contest that these statements are classic hearsay. They are "out-of-court statement[s] offered as evidence to prove the truth of the matter asserted." *United States v. Lamm*, 5 F.4th 942, 948 (8th Cir. 2021). She responds in a passing footnote, however, that these statements are usable at trial either because they are non-hearsay as the statements of a party-opponent, *see* Fed. R. Evid. 801(d)(2)(D), or because they satisfy the exceptions to hearsay as a present sense impression, *see* Fed. R. Evid. 803(1), or a statement of then-existing condition, *see* Fed. R. Evid. 803(3). ECF No. 76 at 32 n.8. Because Wilson's argument lacks any legal analysis, the Court has no obligation to consider it. *See In re Vera T. Welte Testamentary Tr.*, 96 F.4th 1034, 1039 (8th Cir. 2024) (explaining that a court is "not obliged to consider [a] perfunctorily raised, undeveloped argument").

Wilson's argument nevertheless fails on the merits. Start with her claim that these statements are non-hearsay because they were made by Xyleme's "employee[s] on a matter

within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). This rule "requires the proffering party to lay a foundation to show that an otherwise excludible statement relates to a matter within the scope of the agent's employment." *Gulbranson v. Duluth, Missabe & Iron Range Ry. Co.*, 921 F.2d 139, 142 (8th Cir. 1990). Wilson has provided no foundational evidence about the role of these employees, and the Court finds it dubious that such statements would fall "within the scope of their employment." *Ahlberg v. Chrysler Corp.*, 481 F.3d 630, 636 (8th Cir. 2007). It is unlikely, after all, that the "duties" of these Xyleme employees included reporting observations of sex discrimination to Wilson. *Phan v. Trinity Reg'l Hosp.*, 3 F. Supp. 2d 1014, 1019 (N.D. Iowa 1998).

Wilson's hearsay-exception arguments fare no better. A present sense impression is a "statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1). But Wilson has made no showing that the challenged statements were made "while or immediately after" her colleagues perceived her purportedly differential treatment; for example, Wilson does not argue that J.M.'s statement was made immediately after seeing Olivier direct his anger at a woman.

As for the then-existing condition exception, the statement must "be contemporaneous with the declarant's 'then existing' state of mind, emotion, sensation, or physical condition." *United States v. Naiden*, 424 F.3d 718, 722 (8th Cir. 2005); *see* Fed. R. Evid. 803(3). Again, Wilson offers no evidence that there is "substantial contemporaneity of event and statement," so she cannot invoke Rule 803(3). *Naiden*, 424 F.3d at 722 (citation omitted). Moreover, all of these statements appear to be ones of

memory or belief: J.M. remembers Olivier directing his temper toward women, Knapp believes that Xyleme is a "toxic environment" for women, K.B. believes that MadCap's leadership is "misogynistic," and so on. But statements of "memory or belief" are squarely inadmissible "to prove the fact remembered or believed." Fed. R. Evid. 803(3).

Because Wilson offers no other ground on which to admit these hearsay statements, the Court excludes them from its consideration of Xyleme's motion. *See Brooks*, 425 F.3d at 1111.

## II. Sex Discrimination

The MHRA provides that it is an "unfair employment practice" for an employer to "discharge an employee" on the basis of sex. Minn. Stat. § 363A.08, subd. 2(2). Because Wilson provides no direct evidence of sex discrimination, the parties agree that the *McDonnell Douglas* burden-shifting framework applies to her claim. ECF No. 59 at 14; ECF No. 76 at 15; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, Wilson must first establish a prima facie case of sex discrimination. *Henry v. Indep. Sch. Dist. #625*, 988 N.W.2d 868, 883 (Minn. 2023). If she does so, the burden shifts to Xyleme to "articulate a legitimate, nondiscriminatory reason for its conduct." *Id.* If Xyleme satisfies this burden, then it becomes Wilson's burden to demonstrate a genuine factual dispute "that the reason offered by [Xyleme] is merely a pretext for discrimination." *Id.*

The Court will assume that Wilson has established a prima facie case of sex discrimination.[5] Moving along in the *McDonnell Douglas* analysis, the Court determines that Xyleme has articulated a legitimate, nondiscriminatory reason for Wilson's termination, and that Wilson does not show a genuine factual dispute that the legitimate reason is merely a pretext.

**A. Legitimate, Nondiscriminatory Reason**

Xyleme argues that Wilson's termination, and the second RIF generally, was necessary because of financial concerns about Xyleme's continued profitability. ECF No. 59 at 15–16. That argument is borne out in the record: by the end of 2023, Xyleme was operating at a financial loss. ECF No. 62-1 at 31:15–20. In response, Xyleme had laid off 16 employees during its first RIF in February 2024, *id.*; *see* ECF No. 62-5 at 10–11, which failed to improve Xyleme's financial situation, as the Xyleme's sales team only hit 37% to 50% of its quota for the first half of 2024, and through June 2024, the sales team was only projected to achieve 56% of its quota for all of 2024, *see* ECF No. 61 at 2, ECF No. 62-5 at 14. Wilson was one of the lowest performing account executives on her team. ECF No. 68 at 3. Xyleme therefore undertook the second RIF to "further trim overall expenditure to get in line with a more profitable business." ECF No. 62-1 at 31:21–32:2.

---

[5] The parties dispute whether the RIF undertaken by Xyleme was a "bona fide" RIF. ECF No. 59 at 14–15; ECF No. 76 at 17. That dispute appears to stem from Minnesota case law holding that when an employee is terminated pursuant to a "bona fide" RIF, "some additional showing" of sex discrimination is required to establish an employee's prima facie case of discrimination under the MHRA. *Dietrich v. Can. Pac. Ltd.*, 536 N.W.2d 319, 324–25 (Minn. 1995). But because the Court assumes that Wilson has established a prima facie case of sex discrimination, the Court need not decide whether Xyleme's RIF was also "bona fide."

And by September 2025, Xyleme's employee headcount was thirty employees lower than it was by the end of 2023. ECF No. 62-1 at 31:3–20.

Wilson does not explicitly dispute this evidence but instead suggests that Xyleme should have produced a "financial analysis, budget projection, or business plan" to establish that "eliminating any position was necessary." ECF No. 76 at 20–21. But courts "do not sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Doucette v. Morrison County*, 763 F.3d 978, 983 (8th Cir. 2014) (citation omitted).[6] Consequently, "when a company exercises its business judgment in deciding to reduce its work force, it need not provide evidence of financial distress to make it a 'legitimate' RIF." *Regel v. K-Mart Corp.*, 190 F.3d 876, 880 (8th Cir. 1999) (citation omitted) (internal quotation marks omitted). Here, Xyleme has provided uncontested evidence that its business was facing financial difficulties. *See* ECF No. 61 at 2; ECF No. 62-5 at 1; ECF No. 62-1 at 31:21–32:2. That is enough to satisfy Xyleme's "minimal" burden under *McDonnell Douglas* to "articulate a legitimate, nondiscriminatory reason" for the RIF. *Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 878 (8th Cir. 2014); *see Regel*, 190 F.3d at 880; *Rahlf v. Mo-Tech Corp., Inc.*, 642 F.3d 633, 638–39 (8th Cir. 2011) (relying on *Regel* to reject plaintiffs' argument that a RIF was not financially necessary).

---

[6] Wilson only brings a claim for sex discrimination under the MHRA, but the Court may also draw upon Title VII case law because "Title VII and MHRA sex discrimination claims are analyzed under the same framework and may be considered simultaneously." *Pribyl v. County of Wright*, 964 F.3d 793, 795 (8th Cir. 2020). The parties similarly rely on Title VII cases in their briefing.

**B. Pretext for Termination**

Wilson must now demonstrate a genuine factual dispute as to whether her termination as part of the second RIF is "merely a pretext for discrimination." *Henry*, 988 N.W.2d at 883. An employer's otherwise legitimate explanation is pretextual when it is "unworthy of credence." *Hoover v. Norwest Priv. Mortg. Banking*, 632 N.W.2d 534, 545 (Minn. 2001) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)). An employee may also offer evidence that "the employer's stated reason is untrue" or that "an improper reason motivated the discharge decision." *Hanson v. Dep't of Nat. Res.*, 972 N.W.2d 362, 373 (Minn. 2022) (citations omitted) (internal quotation marks omitted).

Wilson's evidence of pretext can largely be divided into two buckets: (1) evidence challenging the RIF process; and (2) evidence of Olivier's treatment of women. ECF No. 76 at 16–29, 35. None of it raises "an issue of fact as to whether [Xyleme's] reason for firing her was pretextual." *Doucette*, 763 F.3d at 978.

**i. RIF Process Evidence**

Wilson challenges several aspects of the RIF that, in her view, undermine the RIF's credibility and suggest that the RIF was a vehicle for sex discrimination.

**a. Lack of Business Need**

Wilson renews her argument that Xyleme fails to show a business need for the RIF. *See* ECF No. 76 at 20–23. As discussed above, the Court is not a "super-personnel department[]" that second guesses when a company should tighten its belt or trim its ranks.

*Doucette*, 763 F.3d at 983. Although Wilson tries to poke holes in Xyleme's evidence,[7] none of those holes undermine the core, undisputed fact that Xyleme was experiencing financial difficulties at the time it instituted the RIF. *See* ECF No. 61 at 2, ECF No. 62-5 at 1; ECF No. 62-1 at 31:21–32:2, 76:23–77:17. Wilson's second-guessing of Xyleme's business decision does not raise a genuine factual dispute as to pretext. *See Rahlf*, 642 F.3d at 638–39 (rejecting similar evidence of alleged pretext).

**b. No Written Guidelines and Single Decisionmaker**

Wilson next casts doubt on the RIF's legitimacy by observing that Olivier alone decided who was terminated and that there is no contemporaneous documentation noting that ARR was used as the measure for the RIF. *See* ECF No. 76 at 18–19, 25–27. Wilson cites no authority holding that a RIF being conducted by a single decisionmaker raises an inference of pretext. Moreover, it is undisputed that Olivier asked Swingruber to prepare a report that detailed which employees Swingruber believed should be included in a RIF and that Wilson was among these employees. ECF No. 62-1 at 76:18–77:25; ECF No. 63 at 3. Although Olivier later relied on different criteria in instituting the RIF, he used Swingruber's report as a "sanity check" in making RIF determinations. ECF No. 75-1 at 78:3–16; ECF No. 75-5 at 62:22–65:15. It is, therefore, not entirely fair to say that

---

[7] Wilson notes the discrepancy in Xyleme's evidence, which shows that Xyleme's sales team hit either 37% or 50% of its quota for the first half of 2024. ECF No. 76 at 21. But even accepting the higher figure as true, a company that fails to meet half of its sales goals is unquestionably not a model of financial success. Additionally, from an absence of evidence, Wilson seems to suggest that Olivier did not even consider financial difficulties at Xyleme when he decided to conduct the RIF. ECF No. 76 at 22. The evidence that is in the record, however, indisputably illustrates that Olivier was aware of Xyleme's financial difficulties at the time the RIF was initiated. ECF No. 62-1 at 31:2–32:5, 76:23–77:17.

Olivier made his RIF determinations in a vacuum. *See Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1004 (8th Cir. 2012) (finding no pretext when two supervisors recommended that a certain employee should be terminated, and the manager with "ultimate authority to terminate" eventually carried out that recommendation).

Wilson is correct that there is no contemporaneous documentation explicitly stating that ARR was used as the metric for the RIF. Although perhaps not a business best practice, this oversight does not create a genuine dispute as to pretext. It is true that the lack of "written criteria or guidelines" for conducting a RIF can demonstrate pretext, but typically when there "is no evidence of an objective plan for implementing a RIF." *Kirsch v. St. Paul Motorsports, Inc.*, No. 11-cv-2624, 2013 WL 1900620, at *4 (D. Minn. May 7, 2013) (discussing RIF that was conducted based on "vague instructions," such as choosing employees for layoff who were "mediocre"). As discussed below, however, the record here provides evidence of objective criteria for implementing a RIF. The Court is not convinced that Wilson's "contention that there should have been more documentation" generates a fact question on pretext. *Fenton v. Bemis Co., Inc.*, No. 4:18-cv-00172-JAJ-HCA, 2020 WL 2744111, at *14 (S.D. Iowa Mar. 6, 2020); *see Suneson v. N. Tool & Equip. Co.*, No. A06-1844, 2007 WL 3076992, at *3 (Minn. Ct. App. Oct. 23, 2007) (finding no genuine dispute as to pretext for employee's termination, even though the employer's documentation of its decisions "could have been clearer"); *see also Schaffer v. Penn Eng'g & Mfg., Corp.*, No. 24-cv-5598, 2026 WL 659403, at *5 (E.D. Pa. Mar. 9, 2026) (rejecting argument that failing to create "contemporaneous internal documents about including [an

employee] in the RIF" demonstrated fact question on pretext (internal quotation marks omitted)).

**c. ARR Metric Was False**

Wilson next argues that the purportedly objective metric for the RIF—lowest ARR—was untrue. ECF No. 76 at 24–28. This argument has several variations. The first is that Xyleme's letter to Wilson providing the statutory truthful reason for her termination did not mention ARR as a criteria for termination. ECF No. 76 at 26. But the letter explains that Wilson was chosen based on her "individual historical sales performance in relation to other account executives in 2023 and year-to-date in 2024." ECF No. 62-8. Even Wilson concedes that this language in the letter could "encompass" a metric like ARR, ECF No. 76 at 26, so the truthful reason letter fails to raise a genuine fact issue over whether ARR was actually the criteria used for the RIF.

The second flavor of this argument revolves around the uncontested fact that when he was first considering a RIF, Olivier decided to terminate E.M. and Wilson (both women), but not J.D. (a man). ECF No. 62-1 at 85:14–25; ECF No. 62-5 at 7. Wilson argues that ARR could not possibly have been used as the RIF criteria because J.D., who had $0 in ARR, was not initially chosen for the RIF. ECF No. 76 at 24–25. As an initial matter, J.D. *was* eventually included in the RIF, ECF No. 77-1 at 2, so Xyleme's criteria for the RIF—lowest ARR—was ultimately borne out in the RIF that was implemented, as the three account executives with the lowest ARRs were laid off, ECF No. 68 at 3. It is not self-evident to the Court that Wilson can show pretext based on Olivier's preliminary RIF plans when a different RIF was ultimately carried out.

Putting that observation aside, this argument could be construed to raise two different theories of pretext: disparate treatment and shifting explanations. As to the first theory, instances of disparate treatment can support a claim of pretext, *see Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994), but a plaintiff must show that the differently treated employees were "similarly situated in all relevant aspects," *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 777 (8th Cir. 1995) (citation omitted). At the pretext stage, "the test for determining whether employees are similarly situated to a plaintiff is a rigorous one." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1076 (8th Cir. 2011) (citation omitted).

Again, the Court is unpersuaded that the record demonstrates disparate treatment. Both Wilson and J.D. were, in fact, terminated. ECF No. 62-5 at 5; *see EEOC v. Kohler Co.,* 335 F.3d 766, 776 (8th Cir. 2003) (explaining that a plaintiff asserting disparate treatment must show that the comparator employee "was treated less favorably"). The fact that Wilson and J.D. received the same ultimate adverse employment decision negates any showing of disparate treatment. *See Surface v. Pacillas*, 797 F. Supp. 3d 673, 685 (W.D. Tex. 2025) (finding no disparate treatment when the plaintiff "received the exact same treatment" as the comparator employee); *Gulley v. County of Oakland*, 496 F. App'x 603, 611 (6th Cir. 2012) (same).

Even if Wilson was treated differently than J.D., it is Wilson's burden to make the "rigorous" showing that she is "similarly situated in all relevant respects" to J.D. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1051 (8th Cir. 2011) (en banc) (citation omitted); *see also Lanear v. Safeway Grocery*, 843 F.2d 298, 301 (8th Cir. 1988) ("It is not up to the

employer to prove dissimilarity."). Wilson baldly asserts that J.D. was "similarly situated" to her. ECF No. 76 at 34. But it is undisputed that Wilson and J.D. were not similarly situated in one material respect: as Olivier explained when adding J.D. to the list of terminated employees, while Wilson was a "seasoned" account executive, J.D. was a "[b]rand new" account executive who was "ramping" up with "[n]o opportunities" and "[n]o sales experience." ECF No. 63 at 3; ECF No. 77-1 at 2. As Olivier explained, while he was planning to let J.D.'s supervisor decide whether to keep him, Olivier ultimately decided that there was no "bandwidth to mentor" J.D. *Id.*; *see* ECF No. 77-2. The record discloses, then, that Wilson, a "seasoned" account executive who was expected to "start seeing net new bookings," ECF No. 77-1 at 2; ECF No. 77 at 5, and J.D., a brand-new account executive who "hadn't ramped up" and needed mentoring, ECF No. 75-2 at 103:4, were not "subject to the same standards" when evaluating their sales performance. *Johnson v. Securitas Sec. Servs. USA, Inc.*, 769 F.3d 605, 613 (8th Cir. 2014) (citation omitted). This difference undermines any claim that Wilson and J.D. were similarly situated. And Wilson offers no argument to the contrary.

As for Wilson's other theory of pretext—shifting explanations—Wilson notes that J.D. (the employee tied for lowest ARR) was not initially selected for the RIF, and when he was selected, "ARR was never mentioned." ECF No. 76 at 25. Rather, Olivier stated at the time that he selected J.D. based on the facts that J.D. was a "[b]rand new rep" with "[n]o sales experience." *Id.* Wilson argues that although Olivier now claims that J.D. was selected due to his nonexistent ARR, Olivier's contemporaneous communications demonstrate that ARR was not actually the metric used to formulate the RIF. *Id.*

A "[s]ubstantial change in an employer's explanation over time can be evidence of pretext, but an elaboration generally is not." *Pulczinski*, 691 F.3d at 1004; *see Hanson*, 972 N.W.2d at 376 (explaining that "shifting reasons . . . may give rise to a fact issue about whether the later-stated reasons are pretextual"). Olivier's current explanation for J.D.'s termination—lack of ARR—is entirely consistent with Olivier's explanation at the time of the RIF: "[n]o sales experience." ECF No. ECF No. 77-1 at 2. After all, ARR is a sales metric, ECF No. 62-6 at 27:12–21, so as Olivier explained during his deposition, it is "implied that [J.D.] has zero [ARR] because he has no sales experience." ECF No. 75-2 at 104:6–10. Because the lack-of-ARR justification "is consistent with" the lack-of-sales justification, there is no shifting explanation to reconcile. *Pulczinski*, 691 F.3d at 1004; *see Hanson*, 972 N.W.2d at 376 (finding no genuine factual dispute as to a purported shifting explanation when the later explanations were "not inconsistent" with the explanation provided earlier).

The final flavor of this argument is that even if the ARR benchmark was truly used to conduct the RIF, then it was measured in a way to guarantee Wilson's selection for the RIF. Specifically, Wilson argues that Olivier chose to measure ARR in August 2024 because it meant that Wilson would not benefit from the expected ARR from Xyleme's deal with Philips—which was "pretty much a done deal" in Olivier's eyes. ECF No. 75-2 at 62:22–23; ECF No. 76 at 27–28. Wilson, however, points to no evidence that Olivier deliberately measured ARR to exclude the Philips deal and artificially lower Wilson's

ARR, and her speculation that he did so does not help her avoid summary judgment.[8] *See Bloom v. Metro Heart Grp. of St. Louis, Inc.*, 440 F.3d 1025, 1028 (8th Cir. 2006) ("[S]peculation and conjecture are insufficient to defeat summary judgment.").

**d. Illogical Termination**

Wilson also argues that it was illogical to terminate her because she was managing a lucrative deal with Philips, so it would not have made sense for Xyleme to "risk one of its largest pending deals by firing the deal's point person." ECF No. 76 at 29. But in considering the question of pretext, the Court's inquiry is "limited to whether the employer gave an honest explanation of its behavior, not whether its action was wise, fair, or correct." *McKay v. U.S. Dep't of Transp.*, 340 F.3d 695, 700 (8th Cir. 2003) (citation omitted) (internal quotation marks omitted). That is particularly true in the RIF context, since "even capable employees are released when an employer is down-sizing." *Hutson*, 63 F.3d at 779. Xyleme recognized that it would need to replace Wilson on the Philips deal, ECF No. 63 at 3, which it did after Wilson was terminated, ECF No. 62-5 at 13. Whether that was a wise business decision is beyond the scope of the Court's review.[9] *See Hutson*,

---

8 Ultimately, Xyleme did not finalize its deal with Philips, ECF No. 62-1 at 59:16–19, undermining Wilson's claim that Xyleme intentionally deprived her of surefire ARR.

9 This record highlights the perils of considering the "illogical" nature of an employee's termination during a RIF. Although it is true that Wilson was the point person for the Philips deal, ECF No. 75-1 at 130:1–17, it is also true that, by either Swingruber's or Olivier's metrics, Wilson was one of the lowest performing account executives on her team and would have been subject to termination either way based on that performance, *see* ECF No. 63 at 3; ECF No. 62-1 at 85:14–25. Whether Xyleme saw greater risk in jeopardizing a lucrative deal or keeping a low-performing employee on its payroll is ultimately a business call that this Court will not second guess. *See Hutson*, 63 F.3d at 781.

63 F.3d at 781 (explaining that courts do not review "the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination").

Ultimately, then, Wilson's challenges to the RIF process and criteria do not raise a genuine factual dispute as to whether Wilson was terminated as a pretext for sex discrimination.

**ii. Olivier's Treatment of Women**

Wilson next offers various evidence of Olivier's disparate treatment of women, but none suffice to demonstrate that her termination was pretext for sex discrimination.

**a. Generally Toxic Work Environment and Disparate Treatment**

Wilson stated in her deposition that Olivier had a reputation at Xyleme for preferring men over women, and that the company under his leadership was "an environment of toxicity for women." ECF No. 62-9 at 15:5–19. Wilson also asserted that she saw "men getting more opportunities than women" at Xyleme, "men being listened to more than women," "women being spoken to as if they were children and not adults," women being "singled out" by Olivier during sales team calls, and the female negotiator from Philips being treated worse by Olivier than the male negotiators. ECF No. 62-13 at 15; ECF No. 75-1 at 12:8–15, 232:12–234:15. But these are the types of "unsubstantiated and conclusory allegations" that are "insufficient to support an inference of pretext." *Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1109 (8th Cir. 1998) (rejecting "bald" and "conclusory allegations" that the plaintiff "was subjected to an evaluation process different

from that used with her fellow employees and that certain white employees received promotions for which they were not qualified”); *Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 945 (8th Cir. 1994) (finding no pretext from “unsubstantiated allegations” that “similarly situated white employees committed the same infractions” and received lesser punishment). Moreover, to prove disparate treatment, Wilson would have had the “rigorous” burden to demonstrate that better-treated men were similarly situated to worse-treated women. *Amini*, 643 F.3d at 1076. Wilson does not attempt to satisfy that burden.

**b. Better Treatment of D.D.**

Wilson also asserted that one of her male colleagues, D.D., received the “best territory,” and that Olivier “showed up to his pre and post and strategy meetings.” *Id.* at 269:1–10. In contrast, Olivier “refused” to attend strategy meetings with Wilson. *Id.* at 130:24–131:2. Again, instances of disparate treatment can support a claim of pretext, but only if Wilson demonstrates that D.D. was “similarly situated in all relevant aspects” to her. *Hutson*, 63 F.3d at 777; *see Rodgers*, 417 F.3d at 854 (placing burden on employee to establish that employees were similarly situated). Wilson offers no evidence to show that D.D. was similarly situated to her, and Xyleme offers at least one way in which they were not similarly situated: D.D.’s sales performance was markedly better than Wilson’s. *See* ECF No. 68 at 3 (showing that D.D.’s ARR for 2023 was 11 times Wilson’s ARR, and his ARR in 2024 was nearly $[redacted], while Wilson’s was $0). Naturally, better performing employees may be treated more favorably by an employer than lower performing employees. Nothing about that situation raises an inference of pretext for sex

discrimination. *See Williams v. United Parcel Servs., Inc.*, 963 F.3d 803, 809 (8th Cir. 2020) (holding that plaintiff was not similarly situated to employees who did not have "similar performance issues" as the plaintiff).

**c. Allegedly Gendered Language**

Wilson next points to remarks Olivier made to her during a Microsoft Teams message exchange on August 7, 2024, in which Olivier accused Wilson of showing her "emotions" and being "argumentative" with the Philips sales team, and that Wilson was coming off as "combative." ECF No. 76 at 31; *see* ECF No. 62-10. Wilson argues that Olivier's use of purportedly gendered language to critique her work performance reflects Olivier's tendency to treat women less favorably. ECF No. 76 at 31.

The Court is cognizant that terms like "emotional," "argumentative," and "combative," may carry a sharper sting and a heavier stigma when applied to female employees because they can unfairly recast the same behaviors that might be seen as confident or assertive in men as problematic in women. *See, e.g.*, Kathryn Abrams, *Title VII and the Complex Female Subject*, 92 Mich. L. Rev. 2479, 2528–29 (1994). Nevertheless, "those comments are not inherently related to being male or female," particularly without any further evidence of overtly gendered comments by Olivier. *Alinoski v. Musculoskeletal Transplant Found., Inc.*, 679 F. App'x 224, 227 (3d Cir. 2017); *see Levon v. Altisource Sols., Inc.*, 755 F. Supp. 3d 1021, 1040 (N.D. Ill. 2024) (concluding that supervisor's comment that female employee was "high maintenance" was "not indicative of gender animus on its own"); *Webster v. U.S. Dep't of Energy*, 443 F. Supp. 3d 67, 85 (D.D.C. 2020) (holding, in a sex discrimination case, that female plaintiff's

"disrespectful and argumentative behavior" constituted a legitimate, nondiscriminatory reason for plaintiff's termination). The comments Wilson cites are poles apart from the overtly sexist remarks at issue in *Price Waterhouse v. Hopkins*, the case she relies on for comparison. *See* 490 U.S. 228, 235 (1989) (noting comments such as the plaintiff was "macho," "overcompensated for being a woman," and should "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry").

Moreover, even if Olivier's comments demonstrated gender animus, the Eighth Circuit and the Minnesota Supreme Court have held that "stray remarks unrelated to the decisional process" are insufficient to raise a genuine factual issue on pretext. *Huber v. Westar Foods, Inc.*, 139 F.4th 615, 628 (8th Cir. 2025) (citation modified); *see Hansen v. Robert Half Int'l, Inc.*, 813 N.W.2d 906, 920 (Minn. 2012) (citation omitted) (rejecting "stray remarks, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process"). Here, Wilson cites to comments made during a single Microsoft Teams message exchange, ECF No. 76 at 31, which is appropriately categorized as a single instance of "stray remarks," *Hansen*, 813 N.W.2d at 920. Moreover, those comments were unrelated to Olivier's decision to terminate Wilson; rather, they related to Olivier's feedback for Wilson on her communication style with the Philips sales team. *See* ECF No. 62-10. There is no evidence in the record suggesting that Wilson was terminated from Xyleme because of her allegedly brusque communication style with the Philips sales team. Wilson has therefore "failed to show any link between these remarks and her

termination." *Rivers-Frison v. Se. Mo. Cmty. Treatment Ctr.*, 133 F.3d 616, 619 (8th Cir. 1998).

**d. Text Messages with Knapp**

Wilson finally points to her text messages with Knapp, who stated that there was "[s]o much misogyny" at Xyleme *and* that she had told another female Xyleme employee that "part of her struggle will be dealing with [Olivier] only listening to men."[10] ECF No. 62-11 at 3; ECF No. 75-4 at 43:13–20. At most, this establishes a genuine factual issue as to whether Olivier generally treats men better. But again, to raise a genuine factual issue as to pretext, Wilson must provide evidence not just that Olivier generally treated men better but that he treated men better when conducting the RIF. *See King v. Guardian ad Litem Bd.*, 39 F.4th 979, 988 (8th Cir. 2022) (explaining that to demonstrate pretext, a plaintiff must demonstrate that her "termination was motivated by discrimination on account of" a protected ground). Knapp's comments about there being "[s]o much misogyny" at Xyleme and Olivier "only listening to men" have nothing to do with the RIF or Wilson's termination. Because those comments are "unrelated to the decisional process," they cannot raise a genuine factual dispute as to whether Olivier discriminated against Wilson on the basis of sex *when conducting the RIF*. *Huber*, 139 F.4th at 628; *see Hansen*, 813 N.W.2d at 920.

---

[10] Xyleme notes that in her deposition, Knapp attempted to recharacterize her text messages and stated that she did not believe that Olivier or Xyleme as a company was misogynistic. ECF No. 59 at 9–10. But the summary judgment record must be viewed in a light most favorable to Wilson. *See Matsushita Elec. Indus.*, 475 U.S. at 587. It is a fair and reasonable inference from Knapp's text messages that she believed there was "[s]o much misogyny" at Xyleme and that Olivier did not listen to women.

Because Wilson's evidence, either singly or collectively, does not raise a genuine dispute as to pretext, the Court grants summary judgment on Count I to Xyleme.

**III. Reprisal**

Count II of Wilson's complaint raises a claim for reprisal under the MHRA. ECF No. 1-1 ¶¶ 71–77. It is an unfair discriminatory practice to engage in reprisal against any person because that person opposed a practice prohibited by the MHRA. *See* Minn. Stat. § 363.03, subd. 7(1). Wilson argues that she was terminated because she raised concerns about Olivier's "gendered" language during a Microsoft Teams message exchange on August 7, 2024. *See* ECF No. 76 at 16; ECF No. 1-1 ¶ 74.

Both Wilson and Xyleme agree that the reprisal claim recalls the *McDonnell Douglas* framework. *See* ECF No. 59 at 20; ECF No. 76 at 15; *see also Hoover*, 632 N.W.2d at 548 ("A reprisal claim is analyzed under the *McDonnell Douglas* burden-shifting test."). That framework requires Wilson to first establish a prima facie case of reprisal, which consists of "(1) statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two." *Hoover*, 632 N.W.2d at 548 (citation omitted). If the plaintiff makes that prima facie showing, then the burden shifts to the employer "to articulate a legitimate and non-discriminatory reason for the adverse employment action." *Fletcher v. St. Paul Pioneer Press*, 589 N.W.2d 96, 102 (Minn. 1999). If the employer satisfies that burden, then the burden shifts back to the plaintiff to show that the proffered reasons for the adverse action "were not the true reason for the action, but were instead a pretext for" reprisal. *Id.*

Xyleme agrees that Wilson can satisfy her prima facie case of reprisal. ECF No. 59 at 20–21. Like with the sex discrimination claim, the Court next finds that Xyleme has proffered a legitimate and non-discriminatory reason for Wilson's termination—such as Xyleme's financial woes, the need for a RIF, and Wilson's low ARR. The burden now shifts back to Wilson to demonstrate that Xyleme's explanation for her termination was "not the true reason." *Fletcher*, 589 N.W.2d at 102.

Wilson essentially relies on the same evidence of pretext for her reprisal claim as she does for her sex discrimination claim (indeed, the discussion of pretext in Wilson's briefing overlaps between the sex discrimination and reprisal claims). ECF No. 76 at 16–29, 35. But the Court has already found that this evidence falls short of raising a genuine factual dispute that Xyleme's non-discriminatory explanation is "unworthy of credence." *Hoover*, 632 N.W.2d at 545. For the same reasons, the Court likewise concludes that this evidence does not raise a genuine factual dispute as to pretext for reprisal.

The only additional evidence that Wilson musters is suspicious timing: Wilson raised her concerns about Olivier's "gendered" language toward her on August 7, 2024, and Olivier decided to include her in the RIF on August 8—the next day. ECF No. 62-1 at 85:14–25; ECF No. 62-5 at 7; ECF No. 62-10. This timing unquestionably looks bad for Xyleme. Temporal proximity between protected conduct by the employee and adverse action by the employer may alone be sufficient to establish a prima facie case of reprisal if the distance is "very close." *Sisk v. Picture People, Inc.*, 669 F.3d 896, 900 (8th Cir. 2012) (citation omitted); *see also Kerber v. Recover Health of Minn., Inc.*, No. A22-0278, 2022 WL 4074806, at *3 (Minn. Ct. App. Sept. 6, 2022) (same). The Court has no doubt that

the one day separating Wilson's complaint about Olivier's "gendered" language and Olivier's decision to include Wilson in the RIF demonstrates "very close" temporal proximity, and Xyleme is wise to concede that Wilson had satisfied her prima facie case. *See* ECF No. 59 at 20–21; *see also Lightner v. Catalent CTS (Kan. City) LLC*, 89 F.4th 648, 656 (8th Cir. 2023) (holding that plaintiff presented prima facie case of retaliation where adverse action was taken within 48 hours of protected conduct).

But "the *McDonnell Douglas* battle is only begun with the prima facie case." *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002). To "prove pretext or actual discrimination requires more substantial evidence" than the prima facie case "because unlike evidence establishing the prima facie case, evidence of pretext and discrimination is viewed in light of the employer's justification." *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir. 2001). The general rule is that "close timing can rarely show pretext on its own." *Huber*, 139 F.4th at 625. Wilson offers no reason why that general rule does not apply here, other than to point to "all the other evidence" of pretext—evidence that the Court has already considered and found lacking. ECF No. 76 at 23. The Court concludes that the only remaining evidence of pretext—temporal proximity—is "insufficient to establish pretext." *Gibson v. Geithner*, 776 F.3d 536, 541 (8th Cir. 2015); *see Smith*, 302 F.3d at 834 (holding that although "extremely close" temporal proximity established prima facie case of retaliation, it did not raise a genuine factual dispute as to pretext); *Huber*, 139 F.4th at 626 (same); *Hanson*, 972 N.W.2d at 376 (same).

That conclusion becomes "all the more true in light of two significant facts." *Smith*, 302 F.3d at 834. First, it is undisputed that Wilson demonstrated performance issues before she complained about Olivier's "gendered" language on August 7, 2024: her ARR was among the lowest of the account executives on her team, and her most recent performance review indicated that Wilson "need[ed] to see movement on other pipeline deals as well" and "start seeing net new bookings."[11] ECF No. 68 at 3; ECF No. 77 at 5. Wilson's difficulty in generating new sales was the reason Xyleme gave for her termination, ECF No. 62-8, so the temporal proximity here carries less weight given Xyleme's preexisting concerns with Wilson's performance. *See Gibson*, 776 F.3d at 542 (observing that the plaintiff's "work performance and adherence to proper procedure were concerns before" she engaged in protected conduct).

Second, it is undisputed that Olivier was already considering a RIF, and that the proposed RIF included Wilson, before August 7, 2024. ECF No. 62-1 at 76:18–77:25 (Olivier considering a RIF in June 2024); ECF No. 63 at 3 (Swingruber recommending Wilson's termination sometime in or before July 2024). The idea of terminating Wilson, therefore, did not emerge from the ether only after she engaged in protected conduct. Viewing this evidence "in light of [Xyleme's] justification" for terminating Wilson,

---

[11] Wilson touts positive language from her performance review to argue that "there were no real performance concerns about [Wilson] before her protected activity." ECF No. 76 at 24. She conspicuously avoids, however, the more critical language in her performance review and does not acknowledge the undisputed fact that her ARR was among the lowest on her sales team.

*Sprenger*, 253 F.3d at 1111, the "coincidental timing" here is not enough to establish pretext, *Huber*, 139 F.4th at 626 (citation omitted).

Because Wilson fails to demonstrate a genuine factual dispute on pretext for her reprisal claim, the Court grants summary judgment to Xyleme on Count II.

## IV. Bad Faith Termination

Wilson's final claim—bad faith termination—must be dismissed for the simple reason that the claim, at least on this record, does not exist under Minnesota law. The Minnesota Supreme Court has squarely rejected the notion that there is an implied covenant of good faith and fair dealing in employment contracts, finding it "unnecessary and unwarranted for the courts to become arbiters of any termination that may have a tinge of bad faith attached." *Hunt v. IBM Mid Am. Emps. Fed. Cred. Union*, 384 N.W.2d 853, 858–59 (Minn. 1986) (citation omitted). Although the Minnesota Supreme Court has "recognized a common-law cause of action for wrongful discharge in violation of public policy," *Nelson v. Productive Alternatives, Inc.*, 715 N.W.2d 452, 454 (Minn. 2006), Wilson does not rely on that strand of case law. Accordingly, Wilson's "bad faith termination" claim is squarely foreclosed by *Hunt*.

Wilson responds by citing two cases, neither of which helps her position. The first case predates *Hunt* and is unpersuasive for that reason alone. *See Buysse v. Paine, Webber, Jackson & Curtis, Inc.*, 623 F.2d 1244, 1249 (8th Cir. 1980). The second, *Bratton v. Menard, Inc.*, 438 N.W.2d 116 (Minn. Ct. App. 1989), is materially distinguishable from this case. In *Bratton*, the Minnesota Court of Appeals restated *Hunt*'s core holding: "Minnesota does not recognize an implied covenant of good faith and fair dealing in

employment contracts." *Id.* at 118. Even so, the court found that there were genuine disputes of material fact as to whether the employee's "employment handbook ha[d] modified the parties' employment contract to require good faith in discharge." *Id.* at 119; *see also Holman v. CPT Corp.*, 457 N.W.2d 740, 743–44 (Minn. Ct. App. 1990) (holding that bad-faith termination claim was viable at summary judgment because there was a genuine factual dispute as to whether the employment contract required good faith termination of employment). Wilson neither argues nor offers any evidence that her employment contract or handbook required good faith in discharge or that Wilson was anything but an at-will employee. Under those circumstances, Wilson cannot maintain a claim for bad faith termination. *See Hunt*, 384 N.W.2d at 858–59. The Court therefore grants summary judgment to Xyleme on Count III.

## CONCLUSION

For these reasons, and based on the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Xyleme's Motion for Summary Judgment (ECF No. 58) is **GRANTED**; and
2. Wilson's complaint (ECF No. 1-1) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: August 31, 2026

s/Laura M. Provinzino
Laura M. Provinzino
United States District Judge